**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| HEALTHNOW NEW YORK INC.; BLUECROSS BLUESHIELD OF WESTERN NEW YORK, INC. (F/K/A BLUE CROSS OF WESTERN NEW YORK); AND BLUESHIELD OF NORTHEASTERN NEW YORK; <br><br> Plaintiffs, <br><br> v. <br><br> WALGREEN CO. AND WALGREENS BOOTS ALLIANCE, INC., <br><br> Defendants. | Civil No.: 1:20-cv-01929 <br><br> **COMPLAINT AND JURY DEMAND** |

## TABLE OF CONTENTS

INTRODUCTION...................................................................................................................................3

I.     PRELIMINARY STATEMENT...............................................................................................3

II.    THE PARTIES.........................................................................................................................7

      A.    Plaintiffs ............................................................................................................... 7

      B.    Defendants............................................................................................................. 8

III.   JURISDICTION AND VENUE............................................................................................11

      A.    Jurisdiction ......................................................................................................... 11

      B.    Venue.................................................................................................................. 11

IV.   FACTS APPLICABLE TO ALL CLAIMS..........................................................................12

      A.    U&C Is The Price Paid By Customers Without Insurance.................................. 12

      B.    The Pharmacy Claims Reimbursement Process. ............................................... 15

      C.    Walgreens Developed its Prescription Savings Club to Compete With "Big Box" Retailers While Maintaining Fraudulently Inflated Reimbursements from Plaintiffs. ........ 18

      D.    Walgreens Reported False U&C Charges. .......................................................... 23

      E.    Tolling of the Statute of Limitations. ................................................................. 24

COUNT I: Fraud...................................................................................................................................28

COUNT II: Fraudulent Concealment.................................................................................................30

COUNT III: Negligent Misrepresentation........................................................................................31

COUNT IV: New York Consumer Protection Act............................................................................33

COUNT V: Unjust Enrichment..........................................................................................................35

PRAYER FOR RELIEF.......................................................................................................................36

JURY DEMAND...................................................................................................................................37

## INTRODUCTION

Plaintiffs HealthNow New York Inc.; BlueCross BlueShield of Western New York, Inc. (f/k/a Blue Cross of Western New York), and BlueShield of Northeastern New York ("Plaintiffs") bring this Complaint against Defendants Walgreen Co. and Walgreens Boots Alliance, Inc. (collectively, "Walgreens" or "Defendants") seeking damages for fraud, fraudulent nondisclosure, negligent misrepresentation, unjust enrichment, and related claims. In support of this action, Plaintiffs state and allege as follows:

## I.   PRELIMINARY STATEMENT

1.      For more than a decade, Walgreens—the largest retail drugstore chain in the United States—has knowingly and intentionally engaged in a fraudulent scheme to overcharge Plaintiffs for prescription drugs by submitting claims for payment at artificially inflated prices. To conceal its scheme, Walgreens has made false statements and omitted material facts in connection with its *true* usual and customary ("U&C") prices—the payment ceiling generally defined as the cash price to a member of the general public paying for a prescription drug without insurance—for prescription drugs dispensed to individuals covered by Plaintiffs' health plans. Walgreens fraudulently submitted inflated U&C prices on millions of claims reimbursed by Plaintiffs. Through its fraudulent scheme, Walgreens has overcharged Plaintiffs millions of dollars for prescription drugs.

2.      Significantly, on January 15, 2019, Walgreens settled claims brought by the United States, 39 states, and the District of Columbia alleging that, from January 2008 through December 2017, Walgreens violated the False Claims Act, 31 U.S.C. § 3729 *et seq.*, by submitting false U&C prices that were higher than the prices it charged for the same drugs sold through its Prescription Savings Club cash discount program ("PSC Program"), thereby

obtaining more money in reimbursements for Medicaid fee-for-service claims than it was entitled to receive.[1]   Walgreens admitted—for the first time—that "in submitting claims for reimbursement," Walgreens "did not identify its PSC program prices as its U&C prices for drugs on the PSC program formulary," despite being so required.[2]   Walgreens further admitted—for the first time—facts demonstrating that the PSC Program itself was a sham, including that it "offered a savings guarantee pursuant to which PSC program members could recoup (in the form of store credit) the difference between the amount they paid to enroll in the program in a given year and the amount they received in discounted savings under the program in that year."[3] Plaintiffs similarly have been damaged by the same fraudulent course of conduct, as described and admitted to by Walgreens in the Walgreens' DOJ Settlement.

3.      Plaintiffs are health care plans offering comprehensive health care services and coverage, including prescription drug coverage, to their members in New York.  When plan members fill prescriptions covered by Plaintiffs at a Walgreens pharmacy, Walgreens submits electronic claims to Plaintiffs for reimbursement for those prescriptions (through Plaintiffs' contracted pharmacy benefit managers ("PBMs")).  In submitting electronic claims for payment, Walgreens is required to truthfully and accurately submit its U&C price for each dispensing event, in accordance with the National Council for Prescription Drug Program ("NCPDP") requirements.  Plaintiffs calculate the drug price to be paid to the pharmacy based on whether the U&C submitted is less than or greater than the negotiated price.  At all relevant times, Walgreens' reimbursement for prescription drugs shall not exceed its U&C price, which

---

[1] Stipulation and Order of Settlement and Dismissal, *U.S. ex rel. Baker v. Walgreens, Inc. and Walgreen Co.*, No. 12 Civ. 0300, ¶ 2(e) (S.D.N.Y. Jan. 15, 2019) (hereinafter "Walgreens' DOJ Settlement").

[2] *Id.* at ¶ 2.

[3] *Id.* at ¶ 2.

functions as a reimbursement ceiling. This is clear in contracts, network pharmacy manuals, payor sheets, and industry standards, which recognize that reimbursements are to be adjudicated under this formula.

4. In 2006, "big box" retailers like Walmart, Target, and Costco disrupted the retail pharmacy market by offering deeply discounted generic drugs—$4 for 30-day supplies—to their customers while also giving third party payors, including Plaintiffs, the benefit of that deal by lowering their U&C prices for the same drugs. Federal health regulators at the Centers for Medicare and Medicaid Services ("CMS") also made clear that generic discount program prices were to be considered the pharmacy's U&C prices for the purposes of billing government healthcare programs.

5. Walgreens recognized the need to retain and attract new customers, but—unlike the "big box" retailers—decided not to absorb substantially reduced margins in connection with lowering its U&C prices submitted to third party payors, including Plaintiffs. Concerned with maintaining its massive pharmacy revenue, which historically accounts for a vast majority of Walgreens' total revenue, and at the same time competing with "big box" retailers and other pharmacies for in-store traffic and cash sales, Walgreens developed and carried out a massive fraud that resulted in substantial financial harm to Plaintiffs.

6. In or around 2007, Walgreens created the PSC Program as an integral part of its systemic overcharging of Plaintiffs for brand and generic prescription drugs dispensed to their members. Walgreens created the PSC Program for two reasons: *first*, to maintain and increase its market share for cash customers by offering deep discounts on prescription drugs, and *second*—and more importantly—to obfuscate its true U&C prices from third party payors, including Plaintiffs. Walgreens artificially divided its cash business, which formerly consisted

5

solely of customers who pay cash, into two segments: customers who pay the high cash price (which it would include in its U&C) and customers who pay the low cash price (*i.e.*, the price offered by the PSC Program or other similar programs, which would be excluded from U&C). In short, Walgreens created the PSC Program in a covert attempt to insulate its high U&C prices by artificially dividing its customer base in a way that would undermine the central purpose of any health company's prescription drug benefit—that Plaintiffs do not pay more than what cash customers pay for the same drugs.

7.      But unbeknownst to Plaintiffs, Walgreens' cash sales under the PSC Program (and other similar programs) far exceeded—in many multiples—Walgreens' sales at its fraudulently inflated U&C prices.  In fact, Walgreens submitted U&C prices that were paid by few—***if any***—actual cash customers, and were regularly five, ten, or even twenty times higher than what Walgreens actually charged cash customers.  Still, on its claims for reimbursement to Plaintiffs, Walgreens reported those artificially inflated "U&C" prices, which were neither usual nor customary, as its U&C prices.  By submitting false and inflated U&C prices to Plaintiffs, Walgreens knowingly and wrongfully overcharged Plaintiffs on millions of claims.

8.      Walgreens knowingly and intentionally concealed from Plaintiffs the ***actual*** cash prices offered to members of the general public paying without insurance—*i.e.*, Walgreens' ***true*** U&C prices—on both brand and generic prescription drugs.  To conceal its fraudulent scheme, Walgreens knowingly made false statements and omitted material facts in connection with its true U&C prices, including, but not limited to, the scope of PSC Program membership; PSC Program eligibility; the enrollment process; the enrollment "fee"; and frequency, share, number, and other key data points related to Walgreens' cash sales under the PSC Program and other

6

similar discount programs; and other discounts (not associated with a discount program) offered to the individuals paying without insurance for drugs also dispensed to Plaintiffs' Members.[4]

9.     As a result of Walgreens' fraudulent scheme, Walgreens has substantially overcharged Plaintiffs for prescription drugs purchased by their Members at Walgreens' pharmacies.  Plaintiffs reimbursed Walgreens for their Members' brand and generic prescription drugs based on Walgreens' inflated U&C prices and, as a result, Plaintiffs were overcharged millions of dollars.

## II.     THE PARTIES

### A.     Plaintiffs

10.     Plaintiff **HealthNow New York Inc. ("HealthNow")** is a New York corporation and is a wholly-owned subsidiary of HealthNow Systems, Inc.  HealthNow is an independent licensee of the Blue Cross and Blue Shield Association.  HealthNow has its principal place of business in Buffalo, New York.  HealthNow, through BlueCross BlueShield of Western New York, Inc. and BlueShield of Northeastern New York, provides a full spectrum of health care plans and services to approximately 600,000 members.

11.     Plaintiff **BlueCross BlueShield of Western New York, Inc. (f/k/a Blue Cross of Western New York) ("BCBS of Western New York")** is a New York corporation and is a wholly-owned subsidiary of HealthNow New York Inc.  BCBS of Western New York has its principal place of business in Buffalo, New York.  BCBS of Western New York provides a full spectrum of health care plans and services to its members.

---

[4] For example, Walgreens also effectuated this fraud by offering a prescription savings club called "JustRx" ("JustRx Program") to customers at more than 1,900 Walgreens-owned Rite Aid-branded pharmacy locations and at Walgreens and Duane Reade pharmacy locations and failing to report these prices as U&C.  Additionally, Walgreens further effectuated this fraud by charging third party branded discount card prices to individuals that pay without insurance, *e.g.*, RxSaver and GoodRx ("third party discount card programs") and, similarly, failing to report these prices as U&C.

12. Plaintiff **BlueShield of Northeastern New York ("BS of Northeastern New York")** is a New York corporation and is a wholly-owned subsidiary of HealthNow New York Inc. BS of Northeastern New York has its principal place of business in New York, New York. BS of Northeastern New York provides a full spectrum of health care plans and services to its members.

## B. Defendants

13. Defendant Walgreen Co. ("Walgreen Co.") is an Illinois corporation that maintains its corporate headquarters at 200 Wilmot Road in Deerfield, Illinois 60015. Until December 31, 2014, Walgreen Co. had no corporate parent. On December 31, 2014, Walgreen Co. became a wholly-owned subsidiary of Defendant Walgreens Boots Alliance, Inc. pursuant to a merger to effect a reorganization of Walgreen Co. into a holding company structure ("Reorganization"), with Walgreens Boots Alliance, Inc. becoming the parent holding company.[5]

14. Defendant Walgreens Boots Alliance, Inc. ("WBA") is a Delaware corporation with its principal place of business and corporate headquarters at 108 Wilmot Road in Deerfield, Illinois 60015. On December 31, 2014, WBA became the successor of Walgreen Co., pursuant to the Reorganization, with WBA becoming the direct parent holding company and Walgreen Co. becoming a wholly-owned subsidiary of WBA.[6]

15. All WBA profits are derived from its wholly-owned operating subsidiaries, including Walgreen Co. Because of their integrated operations, Walgreen Co. and WBA are referred to herein as "Walgreens."

---

[5] Form 10-K for Fiscal Year ending 08/31/2018, WALGREENS BOOTS ALLIANCE, INC. (Oct. 11, 2018) ("WBA 2018 10-K"), at 1, *available at* https://www.sec.gov/Archives/edgar/data/1618921/000162828018012472/wba-2018831x10k.htm (accessed Mar. 12, 2020).

[6] *Id.*

8

16.     During the course of the events alleged in this action, Walgreens operated under the trade name Walgreens or through various Walgreens-affiliated store banners across the United States, including but not limited to:  Duane Reade, Kerr Drug, Super D Drug, USA Drug, Happy Harry's, Med-X Drug, May's Drug, and Drug Warehouse (collectively, "Walgreens-affiliated banners").

17.     Walgreens is the largest retail drugstore chain in the United States based on both revenues and number of stores.  Walgreens operates 9,277 retail pharmacies in all fifty states, the District of Columbia, Puerto Rico, and the U.S. Virgin Islands, including 632 drugstores in the state of New York.[7]

18.     In September 2017, Walgreens announced that it had secured regulatory clearance to purchase 1,932 Rite Aid pharmacy stores "located primarily in the Northeast and Southern U.S." for approximately $4.2 billion.[8]  By March 27, 2018, Rite Aid completed the transfer of all 1,932 stores to Walgreens,[9] and Walgreens now publicly identifies those locations as "Walgreens-owned Rite Aid stores."[10]

---

[7] *Id.* at 3; *see also* "Store Count by State," WALGREENS (Aug. 31, 2019), *available at* https://news.walgreens.com/fact-sheets/store-count-by-state.htm (accessed Mar. 8, 2020).

[8] WBA 2018 10-K at 72; *see also* "Walgreens Boots Alliance Secures Regulatory Clearance for Purchase of Stores and Related Assets from Rite Aid," WALGREENS BOOTS ALLIANCE, INC. (Sept. 17, 2017), *available at* https://www.walgreensbootsalliance.com/news-media/press-releases/2017/walgreens-boots-alliance-secures-regulatory-clearance-purchase (accessed Mar. 10, 2020).

[9] "Rite Aid Completes Transfer of Stores to Walgreens Boots Alliance and Terminates Tax Benefits Preservation Plan," RITE AID CORP. (Mar. 28, 2018), *available at* https://www.riteaid.com/corporate/news/-/pressreleases/news-room/2018/rite-aid-completes-transfer-of-stores-to-walgreens-boots-alliance-and-terminates-tax-benefits-preservation-plan (accessed Mar. 12, 2020).

[10] *See* "Welcome Rite Aid Pharmacy Patients," WALGREENS, *available at* https://www.walgreens.com/topic/pharmacy/welcome_rite_aid.jsp (accessed Mar. 10, 2020).

19.     In fiscal year 2019, Walgreens' U.S. retail pharmacies filled 843.7 million prescriptions (including immunizations).  In fiscal year 2019, Walgreens' U.S. retail pharmacy sales revenue exceeded $104.5 billion.[11]

20.     Walgreens refers to itself as "the largest retail pharmacy, health and daily living destination across the United States and Europe."[12]  Approximately 78 percent of the U.S. population lives within five miles of a Walgreens retail pharmacy location.[13]

21.     At all relevant times, Walgreens is and has been a network pharmacy for every Plaintiff, meaning that Plaintiffs' Members can use their prescription drug benefit to fill their prescriptions at Walgreens pharmacy locations at in-network pricing.  When a Walgreens pharmacy dispenses a prescription to a Member, Walgreens causes an electronic claim for reimbursement to be sent to Plaintiffs' PBM, which then submits a claim for payment to Plaintiffs.  During the relevant time period, Plaintiffs have paid Walgreens through Express Scripts, Inc. (f/k/a Medco Health Solutions, Inc.).

22.     Walgreens is a defendant in two related actions pending in this Court.  On March 23, 2017, a putative nationwide class of third-party payors and insured consumers filed a complaint in *Forth, et al. v. Walgreen Co. and Walgreens Boots Alliance, Inc.*, Civ. No. 17-cv-02246, ECF No. 1 (N.D. Ill.) (Lee, J.).  The allegations in the *Forth* complaint share a similar factual and legal nexus to Plaintiffs' allegations here; for example, that Walgreens "used its PSC [Program] as a mechanism to knowingly and intentionally overcharge consumers and third-party

---

[11] Form 10-K for Fiscal Year ending 08/31/2019, WALGREENS BOOTS ALLIANCE, INC. (Oct. 28, 2019) ("WBA 2019 10-K"), at 4, *available at* https://www.sec.gov/Archives/edgar/data/1618921/000161892119000069/wba-2019831x10k.htm (accessed Mar. 12, 2020).

[12] *Id.* at 1.

[13] *Id.* at 4.

payors . . . in excess of Walgreens' actual U&C prices" for drugs discounted by Walgreens' retail drug programs.[14]  On March 18, 2020, a complaint was filed in *BCBSM, Inc. (d/b/a Blue Cross and Blue Shield of Minnesota), et al. v. Walgreen Co., et al.*, Civ. Case No. 1:20-cv-1853, ECF No. 1 (N.D. Ill.) (Kendall, J.).  The allegations in *BCBSM* complaint share a similar factual and legal nexus to Plaintiffs' allegations here, including, *inter alia*, Defendants' fraudulent misrepresentation of the usual and customary prices of prescription drugs dispensed by Defendants' pharmacies.

## III.  JURISDICTION AND VENUE

### A.  JURISDICTION

23.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1332 and 1367 because Plaintiffs are citizens of New York; the Defendants are citizens of Delaware and Illinois; and the amount in controversy exceeds $75,000.

24.     This Court has general personal jurisdiction over Defendants because Defendants maintain their principal places of business at 108 Wilmot Road and 200 Wilmot Road, both in Deerfield, Illinois, which is located within the Northern District of Illinois.

### B.  VENUE

25.     Venue is proper in the United States District Court for the Northern District of Illinois (Eastern Division) pursuant to 28 U.S.C. §§1391(b-d) because, *inter alia*, both Defendants reside in, and are subject to personal jurisdiction in, this District at the time Plaintiffs commenced this action and because Defendants' contacts within this District are significant and sufficient to subject it to personal jurisdiction.  Further, venue is appropriate in this District

---

[14] *Id.* ¶ 6.

because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

## IV.    FACTS APPLICABLE TO ALL CLAIMS

### A.    U&C Is The Price Paid By Customers Without Insurance.

26.    U&C is the price customers without insurance pay a given pharmacy for prescription drugs, *i.e.*, the cash or uninsured price.  Per the "lesser of" reimbursement formulation, it also serves as a ceiling to how much a pharmacy can charge a health plan (like Plaintiffs) for the drug.

27.    Industry organizations endorse this definition.  The Academy of Managed Care Pharmacy ("AMCP")[15] *Guide to Pharmaceutical Payment Methods* (October 2007) defines U&C as "the price for a given drug or service that a pharmacy or other provider would charge a cash-paying customer without the benefit of insurance provided through a payer or intermediary with a contract with the provider."  The National Council of Prescription Drug Programs ("NCPDP")[16] standards define the U&C price as the "[a]mount charged cash paying customers for the prescription exclusive of sales tax or other amounts claimed."[17]  The U&C price, the NCPDP standards explain, "represents the value that a pharmacist is willing to accept as their total reimbursement for dispensing the product/service to a cash-paying customer."[18]

---

[15] AMCP is an industry-wide organization whose membership includes both health systems and PBMs.

[16] NCPDP is an accredited, non-profit organization that maintains the industry standard for electronic transmission and adjudication of pharmacy claims.

[17] *See NCPDP Reference Manual*, Ch. 3 at 72 (rev. Oct. 2005), *available at* https://www.cms.gov/Medicare/Billing/ElectronicBillingEDITrans/downloads/NCPDPflatfile.pdf (accessed Mar. 12, 2020).

[18] *See Telecommunications Version 5*, NCPDP, at 38 (Feb. 2010), *available at* https://ncpdp.org/members/pdf/Version_5_questions_v35.pdf (accessed Mar. 12, 2020).

28.     For over a decade, federal health programs have consistently required the cash prices offered by pharmacy discount programs to be reported as a pharmacy's U&C prices. These government rules, regulations, and guidance include:

a.     **CMS Guidance to Medicare Part D Sponsors.** CMS published a memo in 2006 that explained: "Wal-Mart recently introduced a program offering a reduced price for certain generics to its customers. The low Wal-Mart price on these specific generic drugs is considered Wal-Mart's 'usual and customary' price, and is not considered a one-time 'lower cash' price. Part D sponsors consider this lower amount to be 'usual and customary' and will reimburse Wal-Mart on the basis of this price."[19]

b.     **Medicare Part D Regulations.** U&C price is defined as "the price that an out-of-network pharmacy or a physician's office **charges a customer who does not have any form of prescription drug coverage** for a covered Part D drug."[20]

c.     **Medicare Prescription Drug Benefit Manual.** U&C price is defined as "the price that an out-of-network pharmacy or a physician's office **charges a customer who does not have any form of prescription drug coverage** for a covered Part D drug."[21]

d.     **TRICARE Pharmacy Manuals.** The pharmacy manual for TRICARE, the health care program for uniformed service members, retirees, and their families, defines U&C price to include "'loss leaders, frequent shopper or special customer

---

[19] *HPMS Q&A – Lower Cash Price Policy*, Memorandum to All Part D Sponsors, Centers for Medicare & Medicaid Services, at 1 (Oct. 11, 2006).

[20] 42 C.F.R. § 423.100 (emphasis added); *see also* 42 C.F.R. §423.160 (incorporating NCPDP standards into the Medicare Part D program).

[21] *See* ch. 5, § 10.2, Benefits and Beneficiary Protections (rev. 9/20/2011) (emphasis added).

discounts or programs, competitor's matched price or any and all other discounts, special promotions, and programs causing a reduction in the price offered to that Member . . . Additionally, the Usual and Customary Retail Price must include any applicable discounts offered to attract customers . . . ."[22]

       e.    **Federal Employees Health Benefits Plan Pharmacy Manuals.** The FEHBP pharmacy manual defines U&C as "**the lowest price Provider would charge a particular patient if such patient were paying cash** for an identical prescription on that particular day at that particular location. This price must include any applicable discounts offered to attract patients."[23]

       f.    **Walgreens PBM—Walgreens Health Initiative.** Walgreens Health Initiative ("WHI") was a wholly-owned PBM subsidiary of Walgreen Co. until WHI was acquired by Catalyst Health Solutions in 2011. WHI's Pharmacy Manual defines U&C as "the cash price including all applicable discounts, coupons or sale price which a cash-paying customer would pay at the pharmacy."[24] In addition, WHI directed its own network pharmacies to use the standard NCPDP form containing the "usual and customary" field discussed above.

29.    State Medicaid programs likewise require cash prices offered by pharmacy discount programs to be reported as a pharmacy's U&C prices. *See, e.g.*, Walgreens' DOJ Settlement.

---

[22] *TRICARE Express Scripts Pharmacy Manual* (2013).

[23] *FEHBP CVS/Caremark Manual* (2009) (emphasis added).

[24] Pharmacy Manual, WALGREENS HEALTH INITIATIVES, INC., 25 (Jan. 2011), *available at* http://www.walgreenshealth.com/pdf/forms/Revised_Pharmacy_Manual_2010_Revised_04072010.pdf (accessed Mar. 12, 2020).

14

30.     More specifically, Walgreens knew that the U&C prices for prescription drugs dispensed to Plaintiffs' Members must include prices that Walgreens charged to cash customers paying without insurance, including "discount" prices.

31.     At all relevant times, Walgreens knew that Plaintiffs contracted to receive the benefit of the prices that Walgreens charged to its customers who paid without insurance, including "discount" prices, in their reported U&C prices.

32.     Plaintiffs' contracts with their PBM recognized and implemented the NCPDP requirements and industry standards, which required Walgreens to report, as the U&C charge, any discount price offered to cash-paying or "private pay" uninsured customers on all claims submitted to Plaintiffs' PBM and to accept payment of that discount price as payment in full.

33.     In short, Walgreens was well aware of both the definition of "usual and customary" and how the "usual and customary" price of a particular prescription drug should be calculated.  But Walgreens knowingly and intentionally submitted inflated U&C prices for brand and generic drugs purchased by Plaintiffs' Members in a way that was antithetical to applicable law, requirements, and standards.

**B.      The Pharmacy Claims Reimbursement Process.**

34.     As a general matter, third party payors, including private and government payors, reimburse pharmacies for the insured portion of prescription drugs at the ***lesser of*** a negotiated price (as reflected in the pricing terms of a governing agreement) and the subject pharmacy's U&C price for both brand and generic prescription drugs.

35.     NCPDP establishes and maintains the industry standard for electronic transmission and adjudication of pharmacy claims.  The NCPDP's standard form contains a

specific data field, designated as field 426-DQ, in which Walgreens represents its U&C charge for that prescription drug.

36.     NCPDP defines the U&C price transmitted in the 426-DQ data field as the "[a]mount charged cash paying customers for the prescription exclusive of sales tax or other amounts claimed."[25]  The U&C price that Walgreens enters into field 426-DQ on a payment claim, the NCPDP standards explain, must represent "the value that a pharmacist is willing to accept as their total reimbursement for dispensing the product/service to a cash-paying customer."[26]

37.     Congress has adopted the NCPDP standards through federal legislation, including the Health Insurance Portability and Accountability Act ("HIPAA"), the Medicare Modernization Act ("MMA"), and the Health Information Technology for Economic and Clinical Health Act ("HITECH").  HIPAA, for example, requires uniform methods and codes for exchanging electronic information with health insurance plans.  These standards are referred to as the NCPDP Telecommunication Standard.  Pharmacies must report claims using NCPDP standards, *inter alia*, when prescribing drugs under Medicare Part D.[27]

38.     Whenever Walgreens fills a Member's prescription, Walgreens submits its claim for Plaintiffs' reimbursement on a standardized NCPDP electronic claim form.

39.     In the retail pharmacy industry, health plans and other third-party payors often use PBMs to adjudicate and administer prescription benefits with a network of pharmacies on their

---

[25] *See NCPDP Reference Manual*, Ch. 3 at 72 (rev. Oct. 2005), *available at* https://www.cms.gov/Medicare/Billing/ElectronicBillingEDITrans/downloads/NCPDPflatfile.pdf (accessed Mar. 12, 2020).

[26] *See Telecommunications Version 5*, NCPDP, 38 (Feb. 2010), *available at* https://ncpdp.org/members/pdf/Version_5_questions_v35.pdf (accessed Mar. 12, 2020).

[27] 42 C.F.R. § 423.160.

behalf. When a health plan employs the services of a PBM, instead of submitting claims directly to the health plan, the retail pharmacy submits claims for payment from the health plan to the health plan's chosen PBM. The PBM directly passes on Walgreens' reported U&C prices to Plaintiffs.

40. Walgreens submits its claims seeking Plaintiffs' reimbursement payments to the PBM that processes Plaintiffs' reimbursement claims. Since 2006, Plaintiffs have paid Walgreens through Express Scripts, Inc. (f/k/a/ Medco Health Solutions, Inc.).

41. The claims-processing and payment mechanics between Plaintiffs, Plaintiffs' PBM, and Walgreens works as follows:

a. A Member presents a prescription at a Walgreens pharmacy (or Walgreens-affiliated banner location) and purchases the corresponding prescription drug, less the share of the purchase price covered by the Member's prescription drug benefit.

b. Walgreens then reports to the Plaintiffs' PBM the data associated with the sale, including the U&C charge for the drug it dispensed to the Member, which Walgreens reports in NCPDP field 426-DQ.

c. Using Walgreens' reported information, the Plaintiffs' PBM adjudicates the claim on Plaintiffs' behalf using the "lesser of" logic that incorporates the reported U&C price term.[28] If Walgreens' reported U&C price for the drug at issue is *greater* than the parties' other negotiated prices, Plaintiffs pay, through their PBM, the negotiated price to Walgreens. If, on the other hand, Walgreens' reported U&C price for the drug at

---

[28] As described above, third party payors reimburse pharmacies for the insured portion of prescription drugs at the **lesser of** a negotiated price (as reflected in the pricing terms of a governing agreement) or the subject pharmacy's U&C charge for prescription drugs.

issue is *less* than the parties' other negotiated prices, then Plaintiffs pay, through their PBM, the reported U&C price to Walgreens.

  d.  As part of the claims adjudication process, Plaintiffs' PBM transmits to Plaintiffs the numerous fields of claims data in the prescribed NCPDP format, including field 426-DQ, which indicates the U&C charges Walgreens reported for the drug at issue.

42.  At all relevant times, for each and every claim submitted by Walgreens to Plaintiffs' PBM, Walgreens knew that the PBM in turn either transmits Walgreens' reported U&C price (as represented in NCPDP field 426-DQ) to Plaintiffs, uses the reported U&C price when calculating a reimbursement amount per the contractual "lesser of" reimbursement formula, or both.

43.  At all relevant times, Walgreens knew that Plaintiffs directly relied upon Walgreens' reported U&C prices in reimbursing Walgreens through their PBM, as described above for prescription claims submitted by Walgreens to Plaintiffs via Plaintiffs' PBM.

44.  At all relevant times, Walgreens knows that the electronic claims adjudication process used the NCPDP field 426-DQ data as a necessary input. Walgreens also knew that Plaintiffs' PBM and Plaintiffs relied on the NCPDP field 426-DQ data as necessary business information in calculating and paying Members' prescription reimbursements on both brand and generic claims submitted by Walgreens.

**C. Walgreens Developed its Prescription Savings Club to Compete with "Big Box" Retailers While Maintaining Fraudulently Inflated Reimbursements from Plaintiffs.**

45.  In 2006, "big box" retailers like Walmart began to launch prescription drug programs that offered steeply discounted prices for hundreds of popular prescription drugs to cash customers. For example, in September 2006, Walmart began offering $4 for 30-day

supplies and $10 for 90-day supplies of the most commonly prescribed generic drugs. Walmart's formulary of low-priced generics, which initially included approximately 140 drugs (totaling more than 300 formulations), was matched by Target and partially by Kmart (which offers 90-day supplies at $15). Many non-pharmacy chains, which were able to absorb lower margins on generic drug sales because pharmacy sales represent such a low percentage of total sales, followed suit. Walmart and Target submit their discounted prices as their U&C prices to third party payors, including Plaintiffs.

46. Walgreens executives labeled these competitor programs as "limited promotions" that provided "no significant savings for the vast majority" of cash customers, concluding that programs like Walmart's generics program were "not positive for healthcare."[29]

47. Walgreens was unwilling to price match Walmart and other "big box" retailers on generic drug prices. In response to those competitor programs, however, Walgreens launched its PSC Program in 2007 to target cash customers and other price-sensitive customers. By 2008, Walgreens offered PSC Program prices at all of its U.S. retail pharmacy locations.[30]

48. Initially, Walgreens' PSC Program offered between 300 and 400 generic medications at $12.99 for a 90-day supply. For those medications, Walgreens advertised a discount price list with some basic information about the eligible medications (*e.g.*, the drug name, strength, and quantity).

49. Walgreens' price lists provided limited information that was insufficient to identify specific drugs eligible for discounted PSC Program prices. For example, Walgreens did

---

[29] *See* Jeffrey A. Rein, Walgreens President & CEO, "*Letter to Shareholders*," 2006 Annual Report, WALGREEN CO., at 4.

[30] Walgreens' DOJ Settlement at ¶ 2(a).

not provide the National Drug Code ("NDC"), a 10-digit universal product identifier for prescription drugs dispensed in the United States. For another example, the Walgreens PSC Program price list advertised 90 tabs of Lisinopril 10mg for $12.99.[31] According to the U.S. Food & Drug Administration's NDC Directory, there are at least 24 different products sold by at least 15 different companies that meet this description.[32] Nor did Walgreens provide other industry-standard identifiers on its PSC Program price list, like the Generic Product Identifier ("GPI"), Generic Sequence Number ("GSN"), or Generic Code Number ("GCN").

50.     The PSC Program was not limited to so-called "value-priced generics" listed on advertised formularies. In addition to these steeply discounted "value-priced" drugs, the PSC Program offered discounted prices on approximately 5,000 to 8,000 other brand and generic prescription drugs to Walgreens' cash-paying customers. Walgreens did not advertise lists or pricing information for the "other name brand and generic prescription medications" eligible for PSC Program prices. Further, Walgreens did not provide lists of the "other name brand and generic prescription medications" eligible for PSC Program prices to Plaintiffs or, on information and belief, to the PBM that processed Plaintiffs' reimbursement claims.

51.     Walgreens claimed that these discount prices were only available to cash-paying customers who paid an enrollment fee. But Walgreens' statements to that effect were illusory

---

[31] "Walgreens Prescription Savings Club" (Dec. 13, 2007) (attached as **Exhibit 1**).

[32] The NDCs include: 53217-303-90, 52427-440-90, 43353-113-60, 50090-1737-5, 71335-0536-4, 70934-200-90, 55700-479-90, 55700-513-90, 49999-182-90, 68180-980-09, 68180-514-09, 63739-349-43, 0006-0106-54, 66267-577-90, 68788-8912-9, 68788-6407-9, 68788-9823-9, 68788-6782-9, 68788-9912-9, 63187-098-90, 63187-821-90, 70518-0530-3, and 50436-0353-3. The manufacturers include: Aidarex Pharmaceuticals LLC; Almatica Pharma Inc.; Aphena Pharma Solutions - Tennessee, LLC; A-S Medication Solutions; Bryant Ranch Prepack; Denton Pharma, Inc. DBA Northwind Pharmaceuticals; Lake Erie Medical DBA Quality Care Products LLC; Lupin Pharmaceuticals, Inc.; McKesson Corporation; Merck Sharp & Dohme Corp.; NuCare Pharmaceuticals, Inc.; Preferred Pharmaceuticals Inc.; Proficient Rx LP; REMEDYREPACK INC.; and Unit Dose Services.

and intentionally misleading. Contrary to Walgreens' assertions that the PSC was a fee-based membership program, the "enrollment fee" (which was nominal at best) was a sham. In its recent settlement with the U.S. Department of Justice, for example, Walgreens admitted that it regularly returned "enrollment fees" to its PSC Program enrollees through, *e.g.*, store credits.[33]

52.    But whether Walgreens charged a nominal enrollment fee in certain instances does not alter the fact that—unbeknownst to Plaintiffs—Walgreens offered the PSC to ***anyone*** who wanted to join and made its discounted drug prices under the PSC widely and consistently available to the general public, and thus cannot be excluded from Walgreens' U&C price. Significantly, in *United States ex rel. Garbe v. Kmart Corp.*, the Seventh Circuit stated that "[a]llowing Kmart to insulate high 'usual and customary' prices by artificially dividing its customer base would undermine a central purpose of the statutory and regulatory structure. The 'usual and customary' price requirement should not be frustrated by so flimsy a device as Kmart's 'discount programs.' Because Kmart offered the terms of its 'discount programs' to the general public and made them the lowest prices for which its drugs were widely and consistently available, the Kmart 'discount' prices at issue represented the 'usual and customary' charges for the drugs." 824 F.3d 632, 645 (7th Cir. 2016), *cert. denied*, 137 S.Ct. 627 (Jan. 9, 2017).

53.    The drugs discounted by the PSC Program were not static. Walgreens regularly revised the brand and generic drugs eligible for PSC Program discounts, the price points at which the drugs were eligible, and the quantum of discounts offered on those drugs. When it revised its PSC Program drug lists, Walgreens did not provide notice to Plaintiffs or, on information and belief, to the PBM that processed Plaintiffs' reimbursement claims.

---

[33] Walgreens' DOJ Settlement ¶ 2(b).

54.     Walgreens' PSC Program continues today.  In its current form, which was launched on or about May 1, 2012, Walgreens' PSC Program allows cash-paying customers to purchase hundreds of prescription drugs on its formulary list for $5.00, $10.00, or $15.00 for 30-day supplies and $10.00, $20.00, and $30.00 for 90-day supplies.  The discount price depends on Walgreens' "tier" classification of the particular drug.  Many of the drugs discounted on the formulary are among the most widely-prescribed drugs in the United States.  Walgreens has also represented that even for brand and generic drugs not listed on this formulary, Walgreens offers reduced PSC Program pricing in other denominations to cash paying customers.

55.     Moreover, Walgreens continues to "offer" a similar "Rx savings program"—the JustRx Program—to customers who pay without using insurance at more than 1,900 Walgreens-owned Rite Aid stores,[34] as well as Walgreens- and Duane Reade-branded Walgreens pharmacies.[35]   Walgreens advertises that the JustRx Program is "simple and free; there is no annual or up-front membership fee to participate."[36]  Like the PSC Program, the JustRx Program provides cash-paying customers with discounts on "all" prescription drugs (and not just those listed on program formularies), with significant discounts available on drugs listed on advertised "value-priced medication" formularies.[37]

---

[34] *See* "Welcome Rite Aid Pharmacy Patients," *supra* n. 10 ("Walgreens is pleased to offer existing Rite Aid patients a new Rx savings program called 'JustRx.'  JustRx is simple and free; there is no annual or up-front membership fee to participate.  JustRx offers eligible patients cost savings on over 300 commonly prescribed generic medications, prices starting at $9.99 for a 30 day supply.  It also includes an average of 40% savings on value priced brand drugs that were not previously available.").

[35] "Value Priced Generics," JUSTRX ("Value-Priced Generics . . . [a]vailable at Walgreens, Duane Reade and Rite Aid Pharmacies Operated by Walgreens."), *available at* https://justrx.com/generics (accessed Mar. 10, 2020).

[36] *Id.*

[37] "Frequently Asked Questions," JUSTRX, *available at* https://justrx.com/faq (accessed Mar. 10, 2020).

22

### D. Walgreens Reported False U&C Charges.

56. Instead of submitting its discounted PSC Program prices, JustRx Program prices, third party discount card program prices, or other discounted cash prices as U&C, Walgreens inflated the U&C prices that it reported to Plaintiffs and their PBM by pegging Walgreens' reported U&C prices to higher prices that did not reflect the cash prices offered to PSC Program enrollees, JustRx Program participants, or third party discount program cardholders.

57. There is no dispute that Walgreens did **not** in fact report its PSC Program prices, JustRx Program prices, or third party discount card program prices, or other discounted prices for prescription drugs made available to those paying without insurance as its U&C price. For example, with respect to PSC Program prices specifically, Walgreens "admit[ted], acknowledge[d], and accept[ed] responsibility for" failing to do so in its January 2019 settlement stipulation with the U.S. Department of Justice, stating that "Walgreens did not identify its PSC program prices as its U&C prices for the drugs on the PSC formulary" on Medicaid fee-for-service claims.[38]

58. For many millions of transactions, Walgreens caused Plaintiffs to pay Walgreens the negotiated price because the negotiated price was lower than the *reported inflated* U&C price. For those many millions of transactions, Walgreens should have reported the true U&C price (*e.g.*, the PSC Program price for a given drug). Had it done so, the adjudicated price—ultimately the price paid by Plaintiffs for the claim—would have, in many cases, been lower than what Plaintiffs paid based on Walgreens reporting a false and inflated U&C price.

---

[38] Walgreens' DOJ Settlement at ¶ 2.

59.     Since 2007, when Walgreens first implemented its PSC Program, Walgreens has submitted to Plaintiffs, through Plaintiffs' PBM, millions of brand and generic retail pharmacy claims for payment using the standardized NCPDP format.

60.     Walgreens' false and misleading U&C reporting caused Plaintiffs to significantly overpay Walgreens on many millions of those Walgreens claims for brand and generic drugs.

**E.     Tolling of the Statute of Limitations.**

61.     As alleged herein, Walgreens affirmatively presented claims for reimbursement to Plaintiffs, through Plaintiffs' PBM, that contained false and inflated U&C prices and further acted to conceal the true U&C prices being charged to its cash customers.

62.     Furthermore, Walgreens used its marketing of the PSC Program to conceal the fraudulent scheme it had implemented.  Walgreens marketed the PSC Program as being a "club" that required "membership" in order to obtain the discount pricing.  Walgreens' marketing effort was meant to present the PSC Program as an "exclusive" program, not available to the general public.  In reality, however, the PSC Program was not exclusive and was available to the general public.  Walgreens used its marketing to conceal the true nature of the PSC Program and the fact that cash-paying customers were paying U&C prices that were lower than the U&C prices Walgreens reported to Plaintiffs.

63.     Walgreens does not provide Plaintiffs with records of transactions involving Walgreens' cash customers, including cash customers paying PSC Program prices, JustRx Program prices, third party discount card program prices, or other discounted cash prices.

64.     Plaintiffs had no information regarding how many of Walgreens' customers were in the PSC Program or JustRx Program, or used third party discount card programs.  Plaintiffs further had no information regarding the actual cash prices charged to customers enrolled in the

24

PSC Program, JustRx Program, or other third-party discount card programs on a drug-by-drug basis, or any other information regarding Walgreens' cash transactions for prescription drugs.

65.     Plaintiffs could not have discovered the truth regarding Walgreens' fraudulent scheme because Walgreens actively concealed information and data from Plaintiffs that was necessary to understand the facts underlying Walgreens' scheme.

66.     Walgreens knew that Plaintiffs and Plaintiffs' PBM would ultimately rely upon the claims data, including the reported U&C charge, that Walgreens submitted to them to pay the claims, and Plaintiffs relied on Walgreens to report its U&C charges truthfully and consistent with industry practice, government regulations, and contract definitions.

67.     Walgreens repeatedly has refused requests made by third party payors like Plaintiffs to produce relevant cash pricing transaction data necessary to validate Walgreens' reported U&C prices like those submitted to Plaintiffs, *i.e.*, records of transactions involving Walgreens' cash-paying and uninsured customers.

68.     Walgreens never notified Plaintiffs that it excluded the prices charged on millions of its steeply discounted PSC Program, JustRx Program, and third party discount card program sales to cash customers from the U&C prices that it reported to Plaintiffs, through Plaintiffs' PBM, on claims submitted for payment.

69.     Instead, Walgreens established a two-track U&C pricing system: one price *reported* as U&C on claims for those customers that used an insurance benefit provided by Plaintiffs; and a different—and almost universally lower—price *actually charged* to customers that did not use an insurance benefit (*i.e.*, cash-paying customers).

70.     Under this two-track U&C pricing system, Walgreens knowingly and intentionally submitted inflated prices to Plaintiffs, through Plaintiffs' PBM, as U&C.

71.     By knowingly and intentionally reporting inaccurate U&C charges to Plaintiffs, through Plaintiffs' PBM, in order to obtain inflated reimbursements for millions of brand and generic prescriptions filled for and sold to Members at Walgreens pharmacies across the country, knowing at all times that Plaintiffs and Plaintiffs' PBM would rely upon the NCPDP field 426-DQ data in making payment decisions, Walgreens misled Plaintiffs and caused Plaintiffs to overpay many millions of dollars.

72.     Walgreens submitted millions of claims for payment to Plaintiffs, through Plaintiffs' PBM—almost all of which included inflated (false) U&C charges.

73.     Walgreens took other active steps to hide its scheme from Plaintiffs.  For example, Walgreens frequently, and without providing any notice to Plaintiffs, changed its PSC Program's scope and prices.  Walgreens also used its marketing terminology as subterfuge to make it look like the PSC Program provided exclusive, limited "club" prices instead of discount cash prices available to the general public.

74.     Walgreens' systematic reporting of inflated U&C charges and its deliberate obfuscation of the cash pricing information for most of the drugs eligible for PSC Program discounts, *inter alia*, prevented Plaintiffs from recognizing Walgreens' misleading and fraudulent pricing scheme.

75.     Walgreens knowingly and fraudulently concealed its true U&C prices every time it reported prices higher than its PSC Program, JustRx Program, and third party discount card program prices to Plaintiffs, through Plaintiffs' PBM, in the NCPDP 426-DQ data field—for many millions of prescriptions that it submitted for payment to Plaintiffs.

76.     As a result of Walgreens' fraudulent concealment, the running of any statute of limitations has been tolled with respect to any claims that Plaintiffs have as a result of the unlawful conduct alleged in this complaint.[39]

77.     Plaintiffs discovered the bases for the causes of action set forth in this complaint not earlier than January 2019.

78.     Since Plaintiffs were unable to know the truth regarding Walgreens' fraudulent conduct until, at the earliest, January 2019, the discovery rule applies to delay the commencement of any statute of limitations that may be applicable to Plaintiffs' claims resulting from the unlawful conduct alleged in this complaint.

79.     As of the date of filing of this complaint, Walgreens continues to submit inflated U&C prices for payment by Plaintiffs, via Plaintiffs' PBM, on claims for generic and brand-name prescription drugs.  Walgreens' inflated U&C prices are in excess of the prices that it charges millions of cash-paying customers enrolled in the PSC Program, JustRx Program, or other third-party discount card programs for the very same drugs.  On millions of payment claims, Walgreens continues to collect higher payment amounts from Plaintiffs than that to which it is entitled.

80.     Moreover, to the extent that any statute of limitations applies to any of Plaintiffs' claims, the running of that limitations period has been tolled by the class action tolling doctrine pursuant to the United States Supreme Court's decision in *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), and subsequent decisions.  *See supra* paragraph 22

---

[39] For example, in Illinois, "[i]f a person liable to an action fraudulently conceals the cause of action from the knowledge of the person entitled thereto, the action may be commenced at any time within 5 years after the person entitled to bring the same discovers that he or she has such cause of action, and not afterwards."  735 ILCS 5/13-215.

## FIRST CLAIM FOR RELIEF (COUNT I)
### FRAUD

81.    Plaintiffs incorporate and repeat the allegations set forth in Paragraphs 1 through 80 above.

82.    On millions of claims for payment, Walgreens deliberately submitted to Plaintiffs, through Plaintiffs' PBM, inflated U&C prices in the NCPDP field 426-DQ that were significantly higher than the prices available to individuals who paid without insurance for prescription drugs. Walgreens made misrepresentations to Plaintiffs' PBM and Plaintiffs each time it reported prices higher than the prices available to individuals who paid without insurance as its U&C charges in the 426-DQ data field on the standardized NCPDP price form.

83.    Walgreens' misrepresentations to Plaintiffs' PBM and Plaintiffs began in 2007 and are ongoing. Walgreens made its misrepresentations to Plaintiffs via Plaintiffs' PBM, knowing that the fraudulently inflated U&C charges it submitted in field 426-DQ of the NCPDP form would materially impact the adjudication process and be communicated to Plaintiffs as the ultimate payor.

84.    Because the U&C price was a payment term necessary for determining Plaintiffs' payment price, the U&C prices Walgreens reported to Plaintiffs' PBM and Plaintiffs were material.

85.    Walgreens knew that the cash prices that it charged PSC Program customers, JustRx Program customers, and third party discount card customers for prescriptions were lower than the inflated U&C charges that Walgreens reported electronically to Plaintiffs' PBM and Plaintiffs on the NCPDP form for the same drugs. Walgreens thus knew that the U&C charges it represented were false and misleading.

86.     Walgreens submitted inflated U&C prices on claims for payment by Plaintiffs with the knowledge and intent that those false U&C prices would be relied upon to adjudicate Plaintiffs' payments, to the benefit of Walgreens.  Specifically, through this fraudulent scheme, Walgreens intended to gain reimbursement payments in amounts far greater than it was entitled.

87.     Plaintiffs lacked the ability to discover Walgreens' fraud.  Plaintiffs had no means to identify how many Walgreens customers were actually paying PSC Program prices, JustRx Program prices, or third party discount card program prices, or to identify the precise list of drugs discounted by those programs, or to identify the prices at which all of those discounted drugs were offered to Walgreens' cash customers.

88.     Plaintiffs justifiably relied on the accuracy of the pricing information that Walgreens reported in NCPDP field 426-DQ.

89.     As a result of Walgreens' fraudulent conduct and Plaintiffs' justifiable reliance, Plaintiffs have sustained immense damage.  Plaintiffs have overpaid hundreds of millions of dollars to Walgreens—if not more.  In addition, Walgreens' fraudulent conduct has prevented Plaintiffs from obtaining more favorable prescription drug prices for its Members.

90.     Walgreens' false and misleading conduct is ongoing:  Walgreens continues to report inflated U&C prices in NCPDP field 426-DQ for claims submitted for payment by Plaintiffs.

91.     Plaintiffs are entitled to recover damages against Walgreens based on fraud in an amount to be determined at trial.

## SECOND CLAIM FOR RELIEF (COUNT II)
### FRAUDULENT NONDISCLOSURE

92.     Plaintiffs incorporate and repeat the allegations set forth in Paragraphs 1 through 91 above.

93.     Walgreens had special knowledge of material facts, *i.e.*, the accurate, non-inflated U&C prices, which the Plaintiffs did not have.

94.     Walgreens concealed material facts, *i.e.*, the accurate, non-inflated U&C prices, from Plaintiffs' PBM and Plaintiffs.

95.     Walgreens knew what the accurate, non-inflated U&C prices were for the prescription drugs for which it submitted claims for reimbursement from Plaintiffs' PBM and Plaintiffs.  These prices were the same prices Walgreens was charging its customers using the PSC Program, JustRx Program, or third party discount programs to purchase the same prescription drugs.

96.     Walgreens knew or should have known that Plaintiffs' PBM and Plaintiffs would rely upon Walgreens' concealment of the accurate, non-inflated U&C prices to adjudicate Walgreens' claims for reimbursement.

97.     Walgreens had a duty to disclose the accurate, non-inflated U&C prices. Walgreens had special knowledge of the accurate, non-inflated U&C prices that Plaintiffs could not have because the prescription drugs covered under Walgreens' PSC Program, JustRx Program, and third party discount card programs—and the prices for those covered drugs— varied, and none of that relevant information was available to Plaintiffs.

98.     As a result of Walgreens' fraudulent nondisclosure, Plaintiffs have sustained immense damage in the form of overpayments to Walgreens totaling millions of dollars.  In

addition, Walgreens' fraudulent conduct has prevented Plaintiffs from obtaining more favorable prescription drug prices for its members.

99.     Walgreens' fraudulent conduct is ongoing: Walgreens continues to report inflated U&C prices in NCPDP field 426-DQ for claims submitted for payment by Plaintiffs.

100.     Plaintiffs are entitled to recover damages against Walgreens based on its fraudulent nondisclosures in an amount to be determined at trial.

## THIRD CLAIM FOR RELIEF (COUNT III)
### NEGLIGENT MISREPRESENTATION

101.     Plaintiffs incorporate and repeat the allegations set forth in Paragraphs 1 through 100 above.

102.     Walgreens made false statements of material fact each time it failed to report its PSC Program, JustRx Program, or third party discount card program pricing as its U&C price on a claim it submitted to Plaintiffs' PBM for reimbursement by Plaintiffs.

103.     Walgreens knew or should have known that the prices it reported in field 426-DQ on claims submitted for Plaintiffs' reimbursement were false.

104.     At the very least, Walgreens exercised both carelessness and negligence in ascertaining the truth of the U&C prices it reported in field 426-DQ on claims submitted for Plaintiffs' reimbursement.

105.     Walgreens controls the mechanism by which it calculates and reports its U&C prices. At all relevant times, Walgreens knew that Plaintiffs and their PBM would rely upon the information that Walgreens calculated and supplied as its U&C price in field 426-DQ to calculate payment amounts in millions of reimbursement transactions. Because Walgreens calculates and reports the U&C prices that its pharmacies report on claims for reimbursement by Plaintiffs and their PBM, Walgreens is in the business of supplying information for the guidance

31

of others in their business transactions. Walgreens consequently owed Plaintiffs a duty to communicate accurate information to Plaintiffs.

106.    Walgreens intended for Plaintiffs' PBM and Plaintiffs to use the U&C prices it reported in field 426-DQ on claims submitted for Plaintiffs' reimbursement to reimburse claims in accordance with the "lesser of" calculation contained, upon information and belief, in the contract between Walgreens and Plaintiffs' PBM, as well as the contract between Plaintiffs and Plaintiffs' PBM.

107.    Plaintiffs acted in reliance on Walgreens' false statements of fact by reimbursing millions of claims according to the prices submitted by Walgreens, including U&C prices reported in field 426-DQ.

108.    As a result of Walgreens' misrepresentations, Plaintiffs have sustained immense damage in the form of overpayments to Walgreens totaling hundreds of millions of dollars. In addition, Walgreens' negligent conduct has prevented Plaintiffs from obtaining more favorable prescription drug prices for its Members.

109.    Walgreens' negligent conduct is ongoing: Walgreens continues to report inflated U&C prices in NCPDP field 426-DQ for claims submitted for payment by Plaintiffs.

110.    Plaintiffs are entitled to recover damages against Walgreens based on Walgreens' negligent misrepresentations in an amount to be determined at trial.

**FOURTH CLAIM FOR RELIEF (COUNT IV)**
**VIOLATION OF THE NEW YORK CONSUMER PROTECTION ACT**
**(N.Y GEN. BUS. LAW § 349, *et seq.*)**

111.    Plaintiffs incorporate and repeat the allegations set forth in Paragraphs 1 through 110 above.

112.    Walgreens' business acts and practices alleged herein constitute deceptive, fraudulent, and materially misleading acts, practices, and statements under the New York Consumer Protection Act ("NYCPA").

113.    The Plaintiffs are, and at all relevant and material times were, "person[s]" for purposes of the NYCPA.

114.    Walgreens' business acts and practices, as alleged herein, violate the NYCPA for the following reasons:

   a.   Walgreens' conduct, as described herein, was consumer-oriented, for purposes of the NYCPA.

   b.   Walgreens knowingly engaged in deceptive, fraudulent, and misleading commercial practices in failing to reveal material facts and information about Walgreens' true U&C prices, which misled Plaintiffs about facts that could not reasonably be known by Plaintiffs;

   c.   Walgreens failed to reveal facts that were material to the transactions at issue in light of representations of fact made in a positive manner;

   d.   Walgreens failed to reveal material facts about Walgreens' true U&C prices to Plaintiffs with the intent that Plaintiffs would rely upon those omissions; and

e.  Walgreens made material representations and statements of fact to Plaintiffs that resulted in Plaintiffs reasonably believing the represented or suggested state of affairs to be other than what they actually were.

115.  Walgreens performed deceptive acts and practices, as described herein, within the State of New York.

116.  Walgreens intended that Plaintiffs rely on Walgreens' misrepresentations and omissions, so that Plaintiffs would reimburse millions of claims at inflated rates.

117.  Had Plaintiffs known Walgreens' true U&C prices, Plaintiffs would have paid millions of dollars less for the reimbursement of claims submitted by Walgreens.

118.  Plaintiffs have been adversely affected by Walgreens' acts, omissions, and practices, as described herein.

119.  Walgreens' actions caused a likelihood of confusion or misunderstanding regarding the true and accurate U&C prices for the prescription drugs dispensed to Plaintiffs' Members.

120.  Walgreens' actions are ongoing: Walgreens continues to report inflated U&C prices in NCPDP field 426-DQ for claims submitted for payment by Plaintiffs.

121.  Walgreens' acts, omissions, and practices, as described herein, proximately caused Plaintiffs to suffer actual damages in the form of, *inter alia*, overpaying reimbursements on millions of prescription claims.  Consequently, Plaintiffs are entitled to actual and treble damages pursuant to N.Y. Gen. Bus. Law § 349(h), as well as reasonable attorney's fees.

122.  Additionally, pursuant to N.Y. Gen. Bus. Law § 349(h), Plaintiffs seek injunctive relief ordering Walgreens to cease reporting inflated U&C prices in its NCPDP field 426-DQ for claims submitted for payment by Plaintiffs.

34

## FIFTH CLAIM FOR RELIEF (COUNT V)
### UNJUST ENRICHMENT

123.     Plaintiffs incorporate and repeat the allegations set forth in Paragraphs 1 through 122 above.

124.     Under the circumstances described herein, Walgreens has owed—and continues to owe—a duty to Plaintiffs to provide Plaintiffs with accurate U&C prices on reimbursement claims.

125.     Because Walgreens fraudulently inflated the U&C prices it reported on millions of claims submitted for Plaintiffs' reimbursement, Plaintiffs were overcharged, and thus overpaid, millions of dollars to Walgreens.

126.     Walgreens knowingly and voluntarily accepted these millions of dollars in overcharges to Plaintiffs.

127.     Plaintiffs' overpayments should not have been paid to Walgreens.  Those millions of overcharges should have been retained by Plaintiffs.

128.     Walgreens' retention of these overcharge amounts violates fundamental principles of justice, equity, and good conscience.

129.     Under the circumstances described herein, it would be inequitable for Walgreens to retain these overcharges.

130.     As a result of Walgreens' wrongful conduct as described herein, Walgreens has been unjustly enriched at the expense of, and to the detriment of, Plaintiffs.

131.     Walgreens is therefore liable to Plaintiffs for restitution in the amount of Walgreens' wrongfully obtained monies.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs seek judgment in an amount to be determined at trial, as follows:

a)      That Plaintiffs are owed at least the amount that Plaintiffs were overcharged on reimbursement claims where Walgreens' reported U&C prices were higher than the true U&C price offered to Walgreens' customers who paid without using insurance for all drugs discounted by the PSC Program (including both drugs listed on advertised formularies and drugs not listed on advertised formularies), JustRx Program, other third party discount card programs, or other discounts for cash-paying customers not associated with a discount program;

b)      That the Court grant permanent injunctive relief to prohibit Walgreens from continuing to engage in the unlawful practices, acts, and omissions described herein;

c)      That the Court award compensatory, consequential, and general damages in an amount to be determined at trial;

d)      That the Court order disgorgement and restitution of all earnings, profits, compensation, and benefits received by Walgreens as a result of its unlawful practices, acts, and omissions;

e)      That the Court award statutory double or treble damages, and other exemplary or punitive damages, to the extent the relevant law permits;

f)      That the Court adjudge and decree that the unlawful acts and omissions alleged in this Complaint are unfair and deceptive business acts and practices in violation of the consumer protection statutes alleged herein;

g)      That the Court award to Plaintiffs the costs and disbursements of the action, along with reasonable attorneys' fees;

h)       That the Court award pre- and post-judgment interest at the maximum rate permitted by applicable laws;

i)       That the Court grant all such other relief as it deems just and proper.

## JURY DEMAND

Plaintiffs hereby demand a jury trial on all claims so triable.

Dated: March 23, 2020                    Respectfully submitted,

                                         */s/ Justin D. Kingsolver*

                                         Stephen J. McBrady (D.C. Bar No. 978847)*
                                         Kent A. Gardiner (D.C. Bar No. 432081)*
                                         Jacinta L. Alves (D.C. Bar No. 992132)*
                                         Kelly H. Hibbert (D.C. Bar No. 1006010)*
                                         Justin D. Kingsolver (N.D. Ill. General Bar No. 6320926)
                                         **CROWELL & MORING LLP**
                                         1001 Pennsylvania Ave. NW
                                         Washington, D.C. 20004
                                         Telephone: (202) 624-2500
                                         Facsimile: (202) 628-5116
                                         SMcBrady@crowell.com
                                         KGardiner@crowell.com
                                         JAlves@crowell.com
                                         KHibbert@crowell.com
                                         JKingsolver@crowell.com

                                         David L. Applegate (IL Bar No. 3122573)
                                         Matthew A. Blumenreich (IL Bar No. 6329458)
                                         **WILLIAMS MONTGOMERY & JOHN LTD.**
                                         Suite 6800 Willis Tower
                                         233 South Wacker Drive
                                         Chicago, Illinois 60606
                                         Telephone: (312) 443-3200
                                         Facsimile: (312) 855-4851
                                         dla@willmont.com
                                         mab@willmont.com

                                         *Attorneys for Plaintiffs*

                                         **Motion for leave to appear pro hac vice forthcoming.*

37